# EXHIBIT 4

| | |
|---|---|
| IN THE HIGH COURT OF JUSTICE<br>KING'S BENCH DIVISION<br>MEDIA AND COMMUNICATIONS LIST | Claim No. QB-2020-002450 |

**B E T W E E N**

**WALTER TZVI SORIANO**

**Applicant / Claimant**

– and –

**(1) FORENSIC NEWS LLC**
**(2) SCOTT STEDMAN**

**Respondents /**
**First and Second Defendants**

**(3) ERIC LEVAI**

**Third Defendant**

---

**RESPONDENTS' SKELETON ARGUMENT**
**for hearing on 6 February 2023**

---

*Suggested pre-reading: (a) the application notice; (b) Rechtschaffen 6; and (c) Doris 4. Time estimate for pre-reading: 1.5 hours. Hearing listed for 2 hours. Page references are to the hearing bundle ("**HB**").*

**A.    Introduction**

1.  This is the hearing of the Claimant's application to restrain the First and Second Defendants (the "**Defendants**") from seeking to obtain evidence through the District Court of the Southern District of New York (the "**NY Court**") for use by them in defending these proceedings.

2.  The Defendants are all US nationals, the Second and Third Defendants being individuals resident in California, with little or no connection to the jurisdiction (see for example [14] of Jay J's judgment ("**Jay Judgment**"): [2021] EWHC 56 (QB)). They are sued here because the Claimant is resident here and the First Defendant's website is accessible by persons accessing the internet from within the UK. They objected to

the exercise over them of the court's jurisdiction and that challenge succeeded in relation to the Claimant's malicious falsehood claim, but failed in relation to his claims in defamation and data protection (in relation to data protection, following a successful appeal by the Claimant: [2021] EWCA Civ 1952, [2022] QB 533).

3.   The procedural steps since the appeal are set out in the fourth witness statement of Patrick Doris acting for the Defendants ("**Doris 4**"). There is to be a hearing on meaning and an application by the Claimant to strike out the Defendants' truth and public interest defences under sections 2 and 4 respectively of the Defamation Act 2003 to the Claimant's defamation claim, listed for 2-3 March 2023.

4.   In the meantime, the Defendants, as they are entitled to, have looked for evidence relevant to the claims against them, including in particular in the US where they reside. Details are set out in Doris 4. These efforts include the making of an application for documentary records (in effect, transaction data) to be produced by HSBC USA under United States Statute 28 USC §1782 for specific disclosure by a third party (the "**1782 (HSBC) Application**").

5.   The basis of the Claimant's application is that the 1782 (HSBC) Application is, "*vexatious, oppressive and unconscionable and* […] *will interfere with the efficient conduct of the present proceedings in London*" (see application notice, box 3) (HB page 207). The Defendants reject each such contention for the reasons set out below.

B.   **Background**

6.   According to the Jay Judgment, the Claimant acquired UK citizenship in 2009 having lived here since 2003. He retains his Israeli citizenship. According to his own evidence, his "*primary business*" is in England but he owns property in the US and Israel and does business abroad. On 24 November 2020, the Defendants asked for more information on such issues: "*No further detail was provided* […] *and the Defendants' request for further information* [made] *on 24th November has not been answered*" (Jay Judgment, [6]). Jay J's unappealed conclusion was that the Claimant "*has been far from forthcoming about his business interests both here and overseas*" (Jay Judgment, [138]). The Defendants' request remains unanswered.

7.  The Claimant's defamation claim relates only to publications 2 to 8 (publication 1 being out of time).

8.  The Claimant's data protection claim relates to all publications, and essentially asserts that the publications misuse his personal data because they are inaccurate.

9.  The Claimant's defamation claim includes the following natural and ordinary meanings (APoC §11) (HB pages 14 to 15):

    (a)  There are strong/reasonable grounds to suspect the Claimant was involved in a conspiracy to interfere with the 2016 presidential election in the United States (publications 4, 5, 6, 7 and 8); and

    (b)  The Claimant is a middleman for a network of illegal Israeli hackers (publication 8).

10. For the purpose of the data protection claim the Claimant pleads numerous other meanings (at APoC §12) (HB page 16). Relevantly, at APoC §12.6 (HB page 17) in relation to publication 8, he pleads that that publication means that he is "*an agent for a network of Israeli hacking and surveillance firms, providing private illegal hacking and spying services*". The Claimant does not appear to include in his plea of inaccuracy under GDPR a plea that the above allegation is inaccurate (see APoC §22.7 (HB page 22) which deals with alleged inaccuracy in publication 8).

11. In their Defence, the Defendants currently meet the libel claim as follows:

    (a)  The Claimant's defamatory meanings are not admitted (Defence §11 (HB page 104), but see below for the Defendants' further Statement of Case on Meaning);

    (b)  Insofar as publication 2 bears either or both of the following two meanings, it is true (Defence §12) (HB pages 104 to 105):

        (i)  There are grounds to investigate whether the relationship between the Claimant and his firm USG Security Ltd ("**USG**") on the one hand, and Deripaska-Sberbank LLC on the other, in respect of services provided to Sochi Airport during the Sochi Olympic Games held in 2014, involved any corrupt payments; and/or

3

  (ii) There are grounds to investigate whether the Claimant had knowledge of improper foreign interference into US politics.

(c) Insofar as the balance of the publications bear the meaning that there are grounds to investigate whether the Claimant had knowledge of improper foreign interference into US politics, they are substantially true.

(d) In any event the publications are on a matter of public interest and the Defendants reasonably believed that publishing them was on a matter of public interest.

12. Despite the Claimant not having pleaded that it is inaccurate to allege that he is an agent for a network of Israeli hacking and surveillance firms providing private illegal hacking and spying services (see APoC §12.6.3 (HB page 17) and the absence of a corresponding plea of inaccuracy at APoC §22.7 (HB page 22)), the Defendants have not yet sought to meet the claim of libel in relation to publication 8 based on a meaning that the Claimant is a middleman for a network of illegal Israeli hackers with a plea of truth.

13. The Defendants' case on the data protection claim is that as residents of the US with very limited if any activity in the UK, the GDPR does not apply to them (Defence §18ff) (HB page 109). In addition, they also rely on the journalistic exemption.

14. The Defendants have filed and served, in response to a Part 18 request by the Claimant, a Statement of Case on Meaning in readiness for the upcoming meaning determination on 2-3 March 2023 in which they plead that the words complained of in the publications include the following meanings (see §7 thereof) (HB page 127):

(a) There are grounds to investigate whether the Claimant had knowledge of Russian interference in the 2016 US Presidential Election.

(b) There are grounds to investigate whether the Claimant is a key middleman in a network of Israeli hacking and surveillance firms with connections to Russian oligarchs, including Oleg Deripaska and NSO Group.

**C.     The 1782 (HSBC) Application**

15.    Details are set out in Doris 4 at §§6ff (HB page 466). In summary:

   (a)    The Defendants have learnt that HSBC USA holds documentary records which appear to evidence a commercial relationship between the Claimant's company USG and convicted hacker Aviram Azari.

   (b)    They consider that such evidence would close the gap in the pleadings, permitting them to meet publication 8 with a plea of truth, insofar as it alleges that the Claimant is involved as a middleman in illegal hacking activities, and possibly contributing to other elements of their truth defence (by providing further grounds to investigate the Claimant for the electoral interference).

   (c)    The Defendants have therefore sought the assistance of the NY Court in obtaining such evidence from HSBC USA, which is the US-based entity that the Defendants understand holds the relevant documents.

**D.     Relevant legal principles**

16.    The primary position under English law is that applications made under United States Statute 28 USC §1782 ("**1782 applications**") are not vexatious or oppressive, even though the applicant could have applied to the English courts for the same relief (South Carolina Insurance Co v Assurantie Maatshappij De Zeven Provincien NV and others [1987] A.C. 24, per Lord Brandon at 42E-G):

> *I cannot see that the re-re-insurers, by seeking to exercise a right potentially available to them under the Federal law of the United States, have in any way departed from, or interfered with, the procedure of the English court. All they have done is what any party preparing his case in the High Court here is entitled to do, namely to try to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe that they need in order to prepare and present their case. It was said that the re-re-insurers could have applied to the High Court under R.S.C. Order 39, rule 2, for letters of request to issue to the proper judicial authorities in the United States. But 28 United States Code, section 1782, allows an application to be made either indirectly by the foreign court concerned or directly by an interested party, and I can see no good reason why the re-re-insurers should not have chosen whichever of these two alternatives they preferred.*

17. Since <u>South Carolina</u>, the relevant legal principles underpinning an application for an injunction restraining a party's 1782 application are familiar to the English courts:

    (a) It is a fundamental principle of English proceedings that the English courts do not, in general, exercise any control over the manner in which a party obtains the evidence which he needs to support his case (<u>South Carolina</u> at 41G-42C, <u>Royal Bank of Scotland Plc v Hicks</u> [2011] EWHC 287 (Ch) at [95]).

    (b) Seeking to exercise a right available under US law is not a departure or interference with the procedure of the English court, even if the procedure in the US court is significantly different from that of the English courts (<u>South Carolina</u>, at 42D-H).

    (c) An application in what may prove to be a just cause should not be considered an abuse of the court's process solely on the basis that it occasions extra costs and inconvenience (<u>South Carolina</u>, at 43G).

    (d) The ability to apply for 1782 applications in aid of its proceedings in this country is a facility available to any litigant (<u>Royal Bank of Scotland Plc v Hicks</u> at [96]).

18. The Claimant's application is one of a number of such applications that have come to the English and Commonwealth courts seeking to restrain an 1782 application. Where 1782 applications were previously restrained by the English or Commonwealth courts, the facts of those cases were completely different. In particular, the present case is **not** one where:

    (a) the trial has already concluded, and so permitting what was a wide-ranging 1782 application would in effect amount to the trial being reopened (<u>Bankers Trust International Plc v PT Dharmala Sakti Sejahtera</u> [1996] C.L.C. 252); or

    (b) a witness was called pursuant to the 1782 application to provide evidence where that witness would be subjected to unwarranted double cross-examination, and where the trial would suffer from unnecessary duplication (<u>Omega Group Holdings Ltd v Kozeny</u> [2002] C.L.C. 132); or

(c)   the trial was to take place in short order and the 1782 application would interfere with the parties' preparation for the trial (<u>Allstate Life Insurance Cov ANZ Banking Corp Ltd</u> (1996) 64 F.C.R. 61 (Aust Fed Ct)).

19. The Defendants are not aware of any case in which an injunction has been issued by the English court to restrain a 1782 application which concerns only the production of documents (or, precisely here, transaction records), which is the case here.

20. It is also important to note that all of the cases referred to above involved 1782 applications in pursuit of either (a) witness evidence, or (b) documentary evidence **and** witness evidence. In none of them was the evidence sought solely documentary in nature, as is the present case here, and as was the case before the House of Lords in <u>South Carolina</u>.

**E.   Submissions responding to the Claimant's application**

21. The Claimant has suggested that the Defendants have made the 1782 (HSBC) Application to avoid their obligation to pay the outstanding costs order granted against them, and that they have "*sought to open up a new front in the US Courts whilst the costs of their failed jurisdiction challenge in the UK remain unpaid*" (Rechtschaffen 6 §12) (HB page 216). The Applicant argues that "*this alone would justify the description of 'unconscionable' and restraint by way of injunction*" (Rechtschaffen 6 §12) (HB page 216). This is misconceived.

22. As to the Claimant's evidence that the Defendants are seeking to avoid the consequences of not having met a costs order against them:

(a)   The Defendants have not brought the 1782 application in the US for this reason. As explained in Doris 4 at §10 (HB page 467), they have brought it there because they understand that is where the documents are. In any event, the Defendants are domiciled in the US.

(b)   Whilst the Claimant has previously threatened both a debarring order in this court and enforcement proceedings in the US, he has not followed through on either. Those would be the proper way of addressing an unpaid costs order, not

       holding such actions over the Defendants in opposition to them taking legitimate steps in support of their defence of the Claimant's claim.

    (c)    In any event, there is little chance of a debarring order succeeding in a case of such importance, which touches on fundamental rights of journalists, including the right to the freedom of expression.

    (d)    As has been explained to the Claimant in correspondence (HB pages 417, 429), the non-payment of the costs order is caused by the Defendants' lack of available financial means.

23. Contrary to what is alleged in the Claimant's evidence, nothing said by or on behalf of the Defendants to the NY Court is misleading (Doris 4 §§25-28) (HB pages 473 to 474).

24. The 1782 (HSBC) Application is not oppressive. If and to the extent that the breadth with which the relief is framed might be said to engage the Claimant's rights, that is properly a matter for the NY Court. The Claimant has applied to intervene in the US proceedings (Doris 4 §§16, 18-19) (HB pages 469 to 471), and it must be presumed that the NY Court will have regard to his rights when making its decision.

25. The 1782 (HSBC) Application does not interfere with the judicial process of these proceedings in this jurisdiction.

**F.**    **Disposal**

26. For the reasons above, the court is asked to dismiss the Claimant's application with costs.

**Charles Falconer KC**
Gibson, Dunn & Crutcher UK LLP
CFalconer@gibsondunn.com

**Jonathan Price**
Doughty Street Chambers
j.price@doughtystreet.co.uk

3 February 2023

8