# EXHIBIT A

Claim No. QB-2020-002450

**IN THE HIGH COURT OF JUSTICE**
**KING'S BENCH DIVISION**
**MEDIA AND COMMUNICATIONS LIST**

B E T W E E N

WALTER TZVI SORIANO

**Claimant**

- and -

(1)  FORENSIC NEWS LLC
(2)  SCOTT STEDMAN
(3)  ERIC LEVAI
(4)  ~~JESS COLEMAN~~
(5)  ~~ROBERT DENAULT~~
(6)  ~~RICHARD SILVERSTEIN~~

**Defendants**

_____

**CLAIMANT'S SKELETON**
for 6 February 2023 hearing
_____

*References to the hearing bundle are in the form [tab/page].*
*Authorities are hyperlinked to Bailii where possible.*

**Key Reading (1.5 hours)**

- Skeleton argument(s)
- Claimant's Application **[35/207-211]**
- Sixth Witness Statement of Shlomo Rechtschaffen **[36/212-216]**
- Claimant's Draft Order **[38/249-250]**
- Defendants' Proposed Subpoena **[37/219-227]**
- Declaration of Patrick Doris **[37/234-243]**
- Fourth Witness Statement of Patrick Doris **[44/463-476]**
- Order of US District Judge Analisa Torres **[30/184]**
- Paragraphs 2-10 of *Soriano v Forensic News* [2021] EWCA Civ 1952

Time estimate is 2 hours.

1

**A.   Introduction**

1. C applies for an urgent anti-suit injunction in respect of D1-2's staggeringly inappropriate evidence-gathering application before the District Court of the Southern District of New York. D1-2 resist the injunction and say that the US Court is the proper forum to decide what evidence should be made available.

**B.   Background**

2. C's case is conveniently summarised in the CA's jurisdiction decision: *Soriano v Forensic News & Ors* [2021] EWCA Civ 1952 at [2] to [10].  D3 is not a party to the US application so can be ignored. D4-6 have settled, so are irrelevant also[1].

3. In its judgment of 21 December 2021 the CA ruled that the libel and GDPR claims would proceed in London.  Warby LJ gave the lead judgment, noting at [68] that "[t]*he defendants published here, on a substantial scale, some seriously defamatory allegations about a British citizen who was domiciled and resident here, and whose reputation was centred here*" and affirming that "*England and Wales was clearly the most appropriate place in which to bring the claim*".

4. A summary of the subsequent procedural chronology is set out in an annex to this skeleton. There has not yet been a CMC or any consideration of the scope of disclosure. A hearing fixed for 2-3 March 2023 will determine the meaning of the publications and whether parts of the Defence should be struck out for being unsustainable on the pleadings.

**C.   C's application**

5. The jurisdiction to restrain by injunction a "1782" application[2] in the US is well established: see *Dreymoor Fertilisers Overseas PTE Ltd v Eurochem Trading GmbH* [2018] EWHC 2267 (Comm) per Males J at [59]-[69].  As with any non-contractual anti-

---

[1] Except to note that D4, who used to write for D1, is an associate in the New York office of Gibson Dunn & Crutcher, D1-3's lawyers in New York and London.

[2] Made under 28 US Code §1782 which, as the Court will know, empowers the US Court to provide assistance in gathering evidence in support of foreign proceedings. D1-2 have applied for permission from the US Court to serve the subpoena.  No such permission has yet been granted.

suit, the test is of "unconscionability". That will depend on all the circumstances, with the Court considering whether it would be "*oppressive, vexatious and constitute an interference with the due process of this court*" if the foreign steps were to continue.

6. Here, C seeks to restrain the 1782 application against HSBC Bank USA NA ("HBUS"). HBUS is the US subsidiary of the HSBC international banking group. C and the company USG Security Limited ("USG") of which he is CEO bank with HSBC in London ("HBUK"). Although neither C nor USG holds any account with HBUS, US dollar payments to or from HBUK will have cleared through HBUS as a correspondent bank. No doubt this will have generated records (although C has no idea of their nature and extent).

7. The breadth of disclosure sought in the US by D1-2 from HBUS could not have been more extravagant. D1-2 seek all documents in the possession of HBUS relating not only to C, the party to these English proceedings, but also the corporate non-party USG and any "*subsidiaries, affiliates, partners, officers, directors, employees, representatives, agents*" of USG[3]. The categories are: "*All documents and communications relating to [C and USG], including but not limited to any and all account information, information relating to any financial transactions, Wire Transfers, and/or CHIPs or SWIFT payment messages regarding any Wire Transfer.*[4]" The timeframe is <u>16 years</u>[5].

8. D1-2's solicitors, Gibson Dunn & Crutcher ("GDC") act for D1-2 in both London and New York. In the application for a subpoena they have airily sought to justify in the US the breadth of the proposed subpoena on the basis of supposed relevance to D1-2's defences to the defamation and GDPR claims and to C's credibility generally[6]. No attempt was made in the US application to identify specific transactions, even illustratively, or to tie the request to any contested fact on the pleadings. It is not so much a fishing expedition as an attempt to empty and dredge the lake.

---

[3]   **[37/222]**, para 1.

[4]   **[37/227]**.

[5]   **[37/222]**, para 7.

[6]   Notwithstanding the English Court's hostility to attempts to compel the disclosure of documents relevant only to credibility: <u>First Subsea Ltd v Balltec Ltd</u> [2013] EWHC 584 (Ch) at [19] (Norris J).

3

9. At 10.46pm on 1 February 2023, GDC served the Fourth Witness Statement of Patrick Doris ("Doris 4") opposing the injunction. Despite Ds having already confirmed on 29 November 2022[7] that they did not anticipate amending prior to the strike-out application, Doris 4 revealed for the first time Ds' desire to find evidence to enable them to amend their Defence to include a <u>new</u> plea of truth (as well as to bolster an existing plea)[8].

10. Whatever the position might be in the US, in England where this libel action is being tried it has been clear for more than a century:

> "[t]he defendant's right ... is to have discovery of all matters relating to the questions in issue as narrowed by the particulars. I do not think in a libel action he is entitled to get anything more ... I think it would be a very bad precedent to suggest that a person can simply by libelling another obtain access to all his books and see whether he can justify what he has said or not. I think it would be very lamentable if we should say when a person has libelled another and has justified and given particulars, that he is entitled to more than discovery of that which relates to those particulars": <u>Yorkshire Provident Life Assurance Co v Gilbert</u> [1895] 2 QB 148, 152 per Lindley LJ[9]."

11. The attempt to obtain evidence which is not for the trial of pleaded issues but to explore whether Ds can add to and improve their pleaded defences is indefensible. The further argument that a 1782 application is as a matter of practicality quicker and more efficient as a means of gathering that evidence than Letters of Request to the US is also misconceived[10]. Insofar as banking records of C and USG are held by HBUS it will only be because they relate to payments to or from HBUK[11]. There is no conceivable justification to seek the US-located records of the US correspondent bank about payments which will be reflected <u>also</u> in records in England where the accounts themselves are held.

---

[7] **[43/439]**, responding to the request of Cs at **[43/415-16]**.

[8] **[44/468]**, para 13.

[9] This principle is described "*as sound today as it was at that time*" by Eady J in <u>Taranissi v BBC</u> [2008] EWHC 2486 (QB). In *Taranissi*, Eady J dismissed an application for specific disclosure in respect of an as yet unpleaded defence of justification. It extends to speculative pre-action disclosure for a "*hoped-for plea of truth*", and equivalent attempts to establish a truth defence or to bolster an inadequately particularised extant truth defence.

[10] **[44/471]**.

[11] **[36/215]**, para 10

4

12. GDC has also told the SDNY Court that the 1782 application is urgent because of the upcoming 2-3 March 2023 hearing in London: "*the evidence is expected to be highly relevant to Petitioners' ability to respond to Mr. Soriano's Strike-Out Application, in the near term…*"[12]. Yet GDC is well aware of that hearing's narrow focus. There is no role for banking disclosure nor indeed deposition evidence[13]. Meaning will be determined based on the publications[14]; strike-out based on the pleadings. The possibility of Ds amending "*to substitute, add to and/or contribute to the currently-pleaded defences*"[15] has nothing to do with the attempt to strike out parts of the Defence as it currently stands.

13. Only after the future shape of the case has been clarified by the 2-3 March 2023 outcome will there be a CMC at which the proper scope of any documentary disclosure can be debated. Insofar as D1-2 wish to contend that any banking records are necessary for the fair disposal of an identified issue then they can make their case at the CMC for a suitably targeted order. Even if disclosure is ordered it may be necessary for C to apply redactions for irrelevance or privilege before anything is seen by D1-2  If unredacted information is particularly sensitive then enhanced protections such as a confidentiality club may be justified. It is far too early to predict the outcome of any such debates. The key point is that it will be for the English Court to weigh the factors and decide whether it is appropriate to intrude into a confidential bank/customer relationship and, if so, then how far and subject to what safeguards.

14. D1-2, acting through GDC, have sought to <u>avoid altogether</u> such checks and balances by proceeding directly against HBUS in New York in order to seek the widest imaginable document production. C was not consulted or notified. Indeed, he learned of the application only after details appeared online. C reasonably suspects that D1-2 see a strategic benefit in the mere publicity attaching to the launch of such 1782 applications

---

[12] **[37/241].**

[13] D1-2 have made an equivalent assertion in respect of their attempts to depose witnesses. The depositions are (currently) outside the scope of the anti-suit application but D1-2's conduct in respect of the depositions is relevant to the Court's discretion in respect of the HSBC evidence.

[14] See <u>Koutsogiannis v The Random House Group Ltd</u> [2019] EWHC 48 (QB), [2020] 4 WLR 25 at [12(x)], the only exception being where there is an innuendo or reverse innuendo meaning pleaded, which does not arise here.

[15] See Doris 4, para 26 **[44/463]**.

5

regardless of the evidence they elicit. C's solicitors have already expressed their concerns about D1-2 appearing to act "*in league with journalists*" in prior 1782 applications[16]. Although C chose not to intervene in or restrain the multiple applications for deposition of witnesses, D1-2's application as against HBUS is of a different order. That is because it seeks to pry into C's own financial affairs and those of USG whilst bypassing any of the control mechanisms of the English Court.  C is in no way looking to withhold or suppress evidence which may genuinely be needed to decide the case at trial.  He is simply insisting that such matters are handled in a fair and appropriate way and not oppressively.

15. It will not have been lost on GDC that its clients are seeking to obtain, by going straight to the back door in New York, banking information which extends far beyond anything they could ever have hoped to obtain by the front door in London, as set out above. Moreover, it was GDC's London litigation partner Patrick Doris who sought to justify to the US Court the need for HBUS material.  Having (correctly) identified that the English Court can in principle object to foreign-evidence gathering which is abusive or unconscionable, Mr Doris (inexplicably) asserts that he is unaware of anything which on these facts could cause the English Court to take that view of D1-2's application in New York[17].  It is striking that Mr Doris has not seen fit to make any similar statement in London in defence of the US subpoena.

16. It is hard to see how Mr Doris can have taken such a benign view of his clients' 1782 application, given the following:

    a.   the confidential and potentially sensitive nature of the financial disclosure sought;

    b.   the breadth of the categories of document;

    c.   the 16-year timeframe;

---

[16]   **[50/411]**.

[17]   **[37/242]**, para 33.

    d.    the potential impact on non-parties (by no means confined to USG and its employees, agents, etc but also the <u>third parties</u> who may be shown as having made or received payments from C or USG);

    e.    the absence of notification to C;

    f.    the procedural prematurity, given that the scope of disclosure is properly a matter for the CMC;

    g.    relatedly, the absence at this stage of any demonstrated need, given that disclosure in London from C may prove sufficient;

    h.    the falsity of the explanation given to the US Court that the evidence is relevant to the strike-out application;

    i.    the associated failure to explain to the US Court that the application's real purpose was to search for a basis to plead new or improved defences;

    j.    generally, the unwarranted interference with efficient case management in London and the duplication of effort on either side of the Atlantic; and

    k.    last but not least, D1-2's failure to pay a penny of the £85,000+VAT outstanding for more than 12 months since their failed appeal on jurisdiction.

17. The costs point deserves emphasis. The resources being deployed by D1-2 in the US Courts on their numerous 1782 applications and the ensuing depositions are substantial. D1-2 have at the same time said that they have no money and so cannot pay the CA costs order. GDC must know and have presumably advised their clients that C's likely response to any disclosure (or other hostile) application in London would have been to seek a limited debarring order preventing the application be heard until outstanding costs were paid[18]. By choosing to proceed instead in the US, D1-2 are seeking a free ride, leaving accrued costs

---

[18]    Debarring D1-2 from defending the claim at all would raise different discretionary considerations.

unpaid whilst forcing C to incur his own costs in both forums. Ds' complaint that <u>they</u> are the ones being inconvenienced and put to unnecessary cost[19] is brazen.

18. Finally, C points to what Ds say was the catalyst for the 1782 Application. According to Doris 4[20], Mr Doris and his GDC colleagues in the US have seen certain "records" of HSBC USA. Despite their apparent importance, these records have <u>not</u> been disclosed in either New York or London and the circumstances in which they were seen by GDC is referred to in only the vaguest of terms. Ms Champion told the SDNY Court: "*this information was provided to me by a source with firsthand knowledge of the existence of these transaction records, some of which I have reviewed on a confidential basis*"[21]. Thus it would seem that this unnamed source is not merely aware of the existence of records but was in a position to show them to GDC. Such murkiness is unacceptable, not least because it cannot be ruled out that a record has been hacked, leaked or forged and is now sought to be used as a platform for open-ended disclosure from HBUS. This very serious consideration alone justifies an injunction so that C is not prejudiced pending more satisfactory explanations by D1-2 and GDC if and when they come to issue a disclosure application in London.

19. It is respectfully submitted that the case for injunctive relief is in the circumstances overwhelming.

**ANDREW FULTON KC**
**Twenty Essex**

**BEN HAMER**
**5RB**

**1 February 2022**

---

[19]  Doris 4, para 30-32 **[44/474]**.

[20]  **[44/466]** para 9.

[21]  **[37/228]** para 2.

## ANNEX: Outline Procedural Chronology following CA outcome

| | | |
|---|---|---|
| 10 January 2022 | C files Re-Amended Particulars of Claim | [2/7-37] |
| 16 March 2022 | Ds file Defence | [5/101] |
| 28 March 2022 | C makes Part 18 Request in relation to meaning | |
| 18 April 2022 | Ds' response to Part 18 Request | [6/124] |
| 16 June 2022 | C's application for preliminary trial on meaning and apply to strike-out | [31/185-189] |
| 21 June 2022 | Nicklin J orders hearing to determine directions for C's application | [27/177] |
| 4 July 2022 | D4-5 settle | [28/180] |
| 28 October 2022 | Nicklin J orders agreed directions for hearing | [29/181] |
| 4 November 2022 | Hearing listed for 2-3 March 2023 | |
| 30 November 2022 | Ds serve statement of case on meaning | [7/126-127] |
| 5 December 2022 | C makes Part 18 Request in relation to meaning | [10/134-135] |
| 6 December 2022 | D1-2 file for US subpoena (without serving C) | [37/219] |
| 19 December 2022 | Ds' response to Part 18 Request | [11/136-137] |
| 19 January 2023 | C files application notice for an anti-suit injunction | [35/207-211] |
| 20 January 2023 | C applies for permission to intervene in the US | [39/252] |
| 1 February 2023 | Ds file Doris4, objecting to the injunction sought | [44/463-476] |
| 2-3 March 2023 | Meaning/strike-out hearing due to take place | |

9